UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | |
|---|---|
| DOUGLAS W. WEITZMAN, Derivatively on Behalf of J.C. PENNEY COMPANY, INC., | Civil Action No. _____ |
| Plaintiff, | SHAREHOLDER DERIVATIVE ACTION |
| v. | |
| MYRON E. ULLMAN III, KENNETH H. HANNAH, THOMAS ENGIBOUS, COLLEEN BARRETT, KENT FOSTER, GERALDINE LAYBOURNE, LEONARD ROBERTS, JAVIER TERUEL, R. GERALD TURNER, RONALD W. TYSOE, and MARY BETH WEST, | |
| Defendants, | |
| and | |
| J.C. PENNEY COMPANY, INC., | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Douglas W. Weitzman ("Plaintiff"), by and through his undersigned counsel, brings this shareholder derivative action on behalf of J.C. Penney Company, Inc. ("JCPenney" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties and unjust enrichment.   Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which include, without limitation: a) review and analysis of public filings made by JCPenney and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on JCPenney's website concerning the Company's public statements; and d) review of other publicly available information concerning JCPenney and the Individual Defendants (defined herein).

## INTRODUCTION

1.      JCPenney is a venerable but troubled company.  As one of the nation's most recognizable retailers, the century-old Company operates 1,102 department stores in 49 states and Puerto Rico.  JCPenney's business consists of selling merchandise and services to consumers through its department stores and its Internet Website at jcp.com.

2.      For much of its history, JCPenney was known for its deep discounts and popularity with middle-market consumers.  However, in connection with an ill-advised and expensive campaign to rebrand JCPenney with what it called a "younger, hipper image," many of these consumers left the Company, resulting in losses nearing $1 billion in 2012.

3.      These losses, which continued into early 2013, created a severe and widely-reported liquidity crisis for JCPenney.  The Company's vendors began raising payment concerns.

Analysts began downgrading the Company's stock.  And investors continued the massive stock selloff that had begun in 2012.

4.      In an attempt to shore up the Company's finances and allay vendor and investor concerns, the Individual Defendants caused JCPenney to enter into a $1.75 billion loan agreement with Goldman Sachs Bank USA on April 29, 2013, and to increase the loan to $2.25 billion on May 22, 2013.  The Individual Defendants touted this credit facility as sufficient to solve all of the Company's liquidity issues as JCPenney prepared for the 2013 holiday season, repeatedly claiming that the loan would allow the Company to retain $1.5 billion of excess liquidity throughout 2013.

5.      This was not the case.  What the Individual Defendants knew and/or recklessly disregarded, but failed to disclose to investors, was that JCPenney would remain cash-strapped without additional financing.   In particular, from approximately August 20, 2013 through September 26, 2013 (the "Relevant Period"), the Individual Defendants (defined herein) caused JCPenney to disseminate materially false and misleading statements to the investing public specifically assuring investors that the Company had sufficient cash through year-end.  As a result of these misleading statements, JCPenney's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $14.47 per share on September 9, 2013.

6.      The truth began to be revealed on September 25, 2013, when a Goldman Sachs analyst reported JCPenney's debt as "underperforming" and stated that the Company would be forced to tap into the debt markets for more cash just to survive the third and fourth quarters of 2013.  A Citibank analyst likewise observed that the Company would need to raise more cash immediately to address "deteriorating vendor relationships (due to weak volumes and growing

anxiety about on-time payments during and after [the] Holiday." On this news, JCPenney's stock fell 15% on September 25, 2013.

7.     Rather than admit the truth, however, the Individual Defendants continued misleading investors.  Before the markets opened on September 26, 2013, the Individual Defendants issued a press release "responding to inquiries" and rebutting the liquidity concerns. Shortly after the markets opened, JCPenney CEO defendant Myron E. Ullman III ("Ullman") declared that he "did not see conditions this year where we'd need to raise liquidity." These misleading statements caused the Company's stock to jump nearly 18% in intraday trading.

8.     The full truth was finally revealed after the markets closed on September 26, 2013 – mere hours after Ullman claimed JCPenney would not need to raise liquidity – when the Individual Defendants caused the Company to announce a public offering of 84 million shares of its common stock.

9.     Then, on September 27, 2013, the Individual Defendants caused JCPenney to issue a press release announcing the pricing of 84.0 million shares of its common stock at $9.65 in a secondary offering, stating that "[t]he Company intends to use the net proceeds from the offering for general corporate purposes."

10.    On this news, JCPenney's stock plummeted $1.37 per share to close at $9.05 per share on September 27, 2013, a one-day decline of 13% on volume of 256 million shares.

11.    The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

- The Company would not have sufficient liquidity to get through year-end and would require additional investments to make it through the holiday season; and

* The Company was concealing its need for liquidity so as not to add to growing vendor anxiety about payments during and after the 2013 holiday season.

12.     As a result of the Individual Defendants' misleading statements, JCPenney stock traded at artificially inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 14% from their Relevant Period high. Moreover, the Individual Defendants' misleading and mixed messages sent investors into what one analyst called a "whiplash," and damaged the Company by introducing "the kind of extreme uncertainty most investors seek to avoid."

13.     The JCPenney Board of Directors ("Board") has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to JCPenney for authorizing or failing to correct the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate JCPenney's rights against its wayward fiduciaries and hold them responsible for the damages they have caused JCPenney.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, including nominal defendant JCPenney, a

substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

16.     Plaintiff is a public holder of 6,900 shares of JCPenney common stock.  He first purchased JCPenney stock on May 28, 2013, and has continuously held this stock ever since. Plaintiff is a citizen of California.

17.     Nominal Defendant JCPenney is a Delaware corporation with its principal place of business located at 6501 Legacy Drive, Plano, Texas 75024.  JCPenney is a citizen of Delaware and Texas.  JCPenney may be served with process by and through its registered agent CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201.

18.     Defendant Ullman served as the Company's Chief Executive Officer ("CEO") and a director throughout the Relevant Period.  Ullman is a citizen of Texas.  Ullman may be  served with process at 17 Robledo Dr., Dallas, TX 75230 or wherever he may be found.

19.     Defendant Kenneth H. Hannah ("Hannah") served as the Company's Chief Financial Officer and Executive Vice President throughout the Relevant Period.  Hannah is a citizen of Missouri.  Hannah may be served with process at 115 Hunters Grove Dr., Saint Louis, MO 63141 or wherever he may be found.

20.     Defendant Thomas Engibous ("Engibous") served as the Company's Chairman of the Board and a member of the Board's Audit Committee and Finance and Planning Committee throughout the Relevant Period.  Engibous is a citizen of Texas.  Engibous may be served with process at 20 Shady Bend Dr., Melissa, TX 75454 or wherever he may be found.

21.     Defendant Colleen Barrett ("Barrett") served as a director throughout the Relevant Period.  Barrett is a citizen of Texas.  Barrett may be served with process at 4307 Williamsburg Rd., Dallas, TX 75220 or wherever she may be found.

22.     Defendant Kent Foster ("Foster") served as a director and a member of the Board's Audit Committee throughout the Relevant Period.  Foster is a citizen of Texas.  Foster may be served with process at 20 Braewood Pl., Dallas, TX 75248 or wherever he may be found.

23.     Defendant Geraldine Laybourne ("Laybourne") served as a director throughout the Relevant Period.  Laybourne is a citizen of New York.  Laybourne may be served with process at 515 W. 23rd Street, New York, NY 10011 or wherever she may be found.

24.     Defendant Leonard Roberts ("Roberts") served as a director, the Chairman of the Board's Audit Committee, and a member of the Finance and Planning Committee throughout the Relevant Period.  Roberts is a citizen of Texas.  Roberts may be served with process at 9481 Lechner Rd., Fort Worth, TX 76179 or wherever he may be found.

25.     Defendant Javier Teruel ("Teruel") served as a director, a member of the Board's Audit Committee, and the Chairman of the Board's Finance and Planning Committee throughout the Relevant Period.  Teruel is a citizen of New York.  Teruel may be served with process at 6 Arrow Tree Ln., Briarcliff Manor, NY 10510 or wherever he may be found.

26.     Defendant R. Gerald Turner ("Turner") served as a director throughout the Relevant Period.  Turner is a citizen of Texas.  Turner may be served with process at 4001 University Blvd., Dallas, TX 75205 or wherever he may be found.

27.     Defendant Ronald W. Tysoe ("Tysoe") served as a director and a member of the Board's Finance and Planning Committee throughout the Relevant Period.  Tysoe is a citizen of

Florida.   Tysoe may be served with process at 530 Bald Eagle Dr., Jupiter, FL 33477 or wherever he may be found.

28.      Defendant Mary Beth West ("West") served as a director and a member of the Board's Audit Committee throughout the Relevant Period.   West is a citizen of Minnesota.   West may be served with process at 2090 Elmwood Dr., Detroit Lakes, MN 56501 or wherever she may be found.

29.      Defendants Ullman, Hannah, Engibous, Barrett, Foster, Laybourne, Roberts, Teruel, Turner, Tysoe, and West are collectively referred to herein as the "Individual Defendants."

30.      Defendants Ullman, Engibous, Barrett, Foster, Laybourne, Roberts, Teruel, Turner, Tysoe, and West are collectively referred to herein as the "Board" or the "Director Defendants."

31.      Defendants Engibous, Foster, Roberts, Teruel, and West are sometimes collectively referred to herein as the "Audit Committee Defendants."

32.      Defendants Engibous, Roberts, Teruel, and Tysoe are sometimes collectively referred to herein as the "Finance and Planning Committee Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.      JCPenney, through its subsidiary, J.C. Penney Corporation, Inc., operates department stores.   The Company sells family apparel and footwear, accessories, fine and fashion jewelry, beauty products through Sephora inside JCPenney and home furnishings.   Its business consists of selling merchandise and services to consumers through its department stores and through its Internet Website at jcp.com.

34.     For much of its history, JCPenney was known for its deep discounts and popularity with middle-market consumers. However, when former Apple, Inc. Stores leader Ron Johnson took over as Chief Executive Officer in November 2011, the "Silicon Valley wunderkind . . . promised to give [JCPenney] a younger, hipper image" with expensive store redesigns that would turn the Company "into a more exciting brand." Bloomberg Businessweek, *J.C. Penney Rehires Myron Ullman to Clean Up Ron Johnson's Mess*, April 11, 2013. Instead, Johnson's plans "alienat[ed]" loyal JCPenney customers "by taking away the discounts they had come to expect." *Id.* As a result, sales fell by 25% in 2012, and the Company lost nearly a billion dollars.

35.     By April 2013, the Company's stock had fallen more than 67% from its all-time higher only one year before. Moreover, the Company faced a liquidity crisis. In response, the Individual Defendants caused the Company to announce on April 29, 2013 that it had entered into a loan agreement with Goldman Sachs Bank USA. The credit facility was originally set at $1.75 billion, but was revised upwards to $2.25 billion on May 22, 2013. According to JCPenney's May 22, 2013 press release announcing the revised loan agreement, the proceeds of the loan were to be used, among other things, "to fund ongoing working capital requirements and other general corporate purposes."

### The Individual Defendants Caused JCPenney to Issue Materially False and Misleading Statements about Its Liquidity Problems During the Relevant Period

36.     Within this context of JCPenney's disastrous 2012 and subsequent liquidity crisis, as well as the Company's entry into a massive loan agreement to address the crisis, the Individual Defendants clearly understood the importance of JCPenney's liquidity situation – both to the Company's vendors and investors. The Individual Defendants were desperate to present

positive news to investors regarding the Company's liquidity and the overall progress of the turnaround, particularly given the sharp decline in JCPenney's stock price over the past year.

37.     Unfortunately, the Individual Defendants knew or recklessly disregarded that JCPenney's cash problems were far more serious than could be addressed through the existing loan facility with Goldman Sachs.  For that reason, the Individual Defendants caused the Company to begin quietly preparing for a secondary public offering of its common stock.

38.     Despite this knowledge, and in breach of their fiduciary duties, the Individual Defendants caused JCPenney to conceal the Company's ongoing liquidity crisis from investors throughout the Relevant Period, beginning on August 20, 2013.

39.     On August 20, 2013, the Individual Defendants caused JCPenney to issue a press release announcing its fiscal second quarter 2013 financial results, the first such financial results released after JCPenney's entry into the loan agreement with Goldman Sachs.[1]  The Individual Defendants caused the Company to report a wider than expected net loss of $586 million or $2.66 per share and net sales of $2.66 billion for the quarter ending August 3, 2013.  Despite the weaker than expected sales figures, the Individual Defendants caused JCPenney to portray a positive liquidity situation.  In particular, the release stated that "[c]ash and cash equivalents were $1.535 billion at the end of the quarter" and "[g]iven the Company's current cash position . . *the Company expects to end the year in excess of $1.5 billion in overall liquidity*."  The release further stated, in part:

> During the quarter, the Company bolstered its financial position by entering into a $2.25 billion senior secured term loan.  The Company ended the quarter with $1.535 billion in cash and cash equivalents.  Taking into account additional funds available under the credit facility, the Company's total available liquidity is $1.85 billion.  Total use of cash is expected to be down substantially in the second half of the year, compared to the first half, as a result of efforts to stabilize the

---

[1]      JCPenney's fiscal year ends on the Saturday closest to January 31.

business and reduce capital expenditures.  As noted above, the Company expects to end the year in excess of $1.5 billion in overall liquidity.

40.       After releasing the Company's second quarter 2013 results on August 3, 2013, the Individual Defendants caused JCPenney to host a conference call for analysts, media representatives and investors during which defendant Ullman represented the following:

> We obviously shared with [suppliers] a significant financial support we arranged with Goldman Sachs, which we had put in place in order to make sure that we had sufficient liquidity to effectuate the turnaround.  And as mentioned in our press release, we expect to have $1.5 billion of available liquidity at year end.

41.       During the same call, defendant Hannah represented the following:

> The financial actions we took in the quarter enabled us to stabilize the business financially and provide us with the necessary resources to complete the turnaround. Given the Company's current cash position, along with the undrawn portion of our credit facility, we expect to end the year with an excess of $1.5 billion in liquidity.

>         \*      \*      \*

> Cash and cash equivalents in the quarter – second quarter of 2013 were $1.535 billion, an increase of $714 million from the end of the first quarter of 2013. Our merchandise inventory is $3.155 billion. We invested $357 million in inventory this quarter as we address the challenges we faced with respect to inventory in key basic items and private brands. Significant progress has been made and we're confident we'll have inventory at appropriate levels throughout the store and online well in advance of the holiday season.

>         \*      \*      \*

> Our financing cash flow was a source of $1.8 billion in the quarter, reflecting the consummation of the $2.25 billion senior secured term loan facility and the completion of the cash tender for the outstanding 7 1/8% debentures due in 2023 for $355 million. Our cash balance of $1.535 billion and the unused portion of our credit facility provide the Company liquidity of $1.85 billion. The total liquidity available to the Company is expected to be in excess of $1.5 billion at year-end given the improvements we're experiencing in the business.

42.       Later in the call, in response to a question from Sterne, Agee & Leach analyst Charles Grom regarding the Company's liquidity, defendant Hannah stated, in part:

> *We are not assuming that we see some huge trend change in the business. I think when we look at what we're seeing right now over the last several months and the improvements that we've experienced and then what we're seeing here early here in August, I think we're very comfortable that the $1.5 billion liquidity is in line for year end.*

43.    Also during the call, defendant Hannah had the following exchange with JPMorgan analyst Matthew Boss:

> [BOSS:]   And then looking forward, do you think you'd need any additional outside liquidity?
>
> [HANNAH:]   Certainly as we look through the end of the year, *the $1.5 billion of liquidity that we have projected we're not assuming that we need any additional financing.*

44.    On this news, JCPenney stock closed up nearly 6% to $14.01 from its previous day's close of $13.22.

45.    On September 9, 2013, JCPenney reached its Relevant Period high of $16.70.

<u>The Individual Defendants Continue to Mislead Investors as the Truth is Revealed</u>

46.    On September 25, 2013, only one month after the Individual Defendants represented that JCPenney would have sufficient liquidity from the Goldman Sachs loan agreement without the need for "any additional financing," Goldman Sachs analyst Kristen McDuffy ("McDuffy") declared just the opposite.   Presenting a report about Goldman Sachs' existing credit agreements, McDuffy assigned JCPenney's debt a rating of "underperform," reporting that the Company needed to take on additional debt just to ensure that it has enough cash to keep its business operating:

> Weak fundamentals, inventory rebuilding, and an underperforming home department will likely *challenge J.C. Penney's liquidity levels in the third quarter*.   In order to safeguard against a potentially poor fourth-quarter holiday season, *it is likely that management will look to build a bigger liquidity buffer*.

47.    Citigroup, Inc. analyst Deborah Weinswig likewise sounded the alarm about JCPenney's liquidity issues in a report to investors indicating that the Company "may need to

raise capital to cushion against a potentially challenging holiday season." Weinswig even questioned the Company's ability to meet its vendor obligations, observing that "[t]he turnaround is taking longer than we anticipated, and we are concerned about a softening macro environment combined with *deteriorating vendor relationships due to weak volumes and growing anxiety about on-time payments during and after holiday*."

48.     On this news, JCPenney stock dropped $1.78 per share to close at $10.12 on September 25, 2013, a one-day decline of nearly 15% on high volume.

49.     Rather than confirm the truth about JCPenney's liquidity crisis, the Individual Defendants again sought to mislead shareholders by painting an unrealistically optimistic picture about the Company's health.

50.     On September 26, 2013, before the market opened, the Individual Defendants caused JCPenney to issue a press release entitled "JCPenney Responds to Inquiries," which stated in part:

> In response to inquiries, JCPenney said today that it is pleased with its progress thus far in the Company's turnaround efforts and the traction its initiatives are starting to achieve.  Moreover, the Company said it is starting to see greater predictability in its performance across many areas.
>
> The Company continues to be encouraged by improvements in purchase conversion both in store and on jcp.com, primarily due to being back in stock in key items and sizes the customer expects to find at JCPenney. Overall sales on jcp.com continue to trend double digits ahead of last year.
>
> The Company still anticipates it will experience positive comparable store sales trends coming out of the third quarter and throughout the fourth quarter of 2013.

51.     Defendant Ullman sought to reinforce the message to investors shortly after the markets opened on September 26, 2013, telling CNBC *that he did not see conditions this year where JCPenney would "need to raise cash." See* Reuters, *J.C.Penney sees no need to raise*

*cash this year – CEO*, September 26, 2013; The New York Times, *J.C. Penney to Raise Cash in Offering of Its Shares*, September 26, 2013.

52.     These misleading messages temporarily had their intended effect, causing a brief intraday 18% jump in the price of JCPenney's stock.

53.     However, after the markets closed on September 26, 2013, and only hours after defendant Ullman declared that JCPenney would not "need to raise liquidity," the Individual Defendants caused JCPenney to issue a press release announcing a proposed public offering of its common stock, which stated in part:

> J. C. Penney Company, Inc. (the "Company") announced today that it has commenced an underwritten public offering of 84.0 million shares of its common stock. ***The Company intends to use the net proceeds from the offering for general corporate purposes.***

54.     On this news, the Company's stock fell 5% in high-volume after hours trading.

55.     Then, on September 27, 2013, the Individual Defendants caused JCPenney to issue a press release entitled "J. C. Penney Announces Pricing of Public Offering of Common Stock," which stated in part:

> J. C. Penney Company, Inc. (the "Company") announced today that the previously announced underwritten public offering of 84.0 million shares of its common stock priced to the public at $9.65 per share.  The Company intends to use the net proceeds from the offering for general corporate purposes.  The offering is expected to close on October 1, 2013, subject to certain customary conditions.
>
> The Company has granted the underwriters a 30-day option to purchase up to an additional 12.6 million shares of common stock.

56.     On this news, JCPenney's stock plummeted $1.37 per share to close at $9.05 per share on September 27, 2013, a one-day decline of 13% on volume of 256 million shares.

57.     The damaging consequences of the Individual Defendants' mixed and misleading messages regarding JCPenney's liquidity problems were aptly summarized by analyst Richard

Collings' September 27, 2013 article entitled "The Deal: J.C. Penney Investors Suffer Whiplash":

> Late morning on Thursday, Sept. 26, CNBC reported that J.C. Penney's CEO Myron "Mike" Ullman told investors: "We don't see conditions this year where we'd need to raise liquidity."
>
> To which investors promptly responded by sending the retailer's stock up 18% from its low to a high of $11.22 per share . . .
>
> Then, after market close, J.C. Penney announced it had commenced a public offering of 84 million shares of its common stock.
>
> The new shares are dilutive to J.C. Penney's current shareholders by 38%, with 220 million shares outstanding as of August 3, according to a regulatory filing.
>
> And, if the underwriters' option to purchase an additional 12.6 million shares is fully exercised, that means a dilution of nearly 44%.
>
> ***Those who bought the stock on Thursday must now have a sick feeling in their stomachs. The quick cascade of events is the kind of extreme uncertainty most investors seek to avoid.***
>
> ***It can't look good for the CEO of a public company to say it will eschew fundraising and the stock rises, only to have that same company announce a highly dilutive offering a few hours later.***

58.     The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

- The Company would not have sufficient liquidity to get through year-end and would require additional investments to make it through the holiday season; and

- The Company was concealing its need for liquidity to assuage investors and to lessen vendor concerns about timely payments during the holiday season.

59.     As a result of the Individual Defendants' misleading statements, JCPenney stock traded at artificially inflated levels during the Relevant Period.   However, after the above

revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 14% from their Relevant Period high.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

60.     By reason of their positions as officers, directors, and/or fiduciaries of JCPenney and because of their ability to control the business and corporate affairs of JCPenney, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage JCPenney in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of JCPenney and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

61.     Each director and officer of the Company owes to JCPenney and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

62.     In addition to these duties, the members of the Audit Committee owed specific duties to JCPenney under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and to ensure that the Company had

appropriate and effective internal controls over financial reporting.  In particular, JCPenney's Audit Committee Charter states as follows:

> The Committee shall have the following duties and responsibilities:
>
> A.      With respect to independent auditors:
>
> 1.      To be directly responsible for and have the sole authority for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of disagreements between   management   and   the   auditor regarding    financial reporting), who shall report directly to the Audit Committee, and for the approval of all audit and engagement fees, and any significant non-audit fees;
>
> 2.      To  be directly responsible and have the sole authority for the appointment, compensation,   retention and oversight   of any registered public accounting   firm, other  than the independent auditor, engaged for the purpose of preparing or issuing an audit report or to perform audit review or attestation services, which firm shall report directly to the Audit Committee;
>
> 3.      To pre-approve, or to adopt appropriate procedures to pre-approve, all audit and non-audit services to be provided by the independent auditor;
>
> 4.       To evaluate, at least annually the performance of the independent auditor, including a  specific  evaluation  of  the  lead  partner  of  the  independent  auditor, whether there should be a rotation of the audit firm itself and of any other factors as may be required by the NYSE and other applicable laws and regulations;
>
> 5.       To obtain and review, at least annually, a report by the independent auditor (it being  understood  that  the  independent  auditor  is responsible  for  the  accuracy and completeness  of  this  report)  describing: (i) the firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; (iii) all relationships between the independent auditor and the Company and disclosing any relationships or services that may impact the quality of audit services or the objectivity and independence of the independent auditor; and to recommend that the Board of Directors take appropriate action in response to the report of the independent auditor to satisfy itself of the auditor's independence;
>
> 6.       To obtain from, review and discuss with the independent auditor, in connection with any audit, a timely report relating to the Company's annual    audited    financial statements describing all critical accounting policies and practices used, all alternative treatments of financial information within generally accepted    accounting principles that have been discussed with management, ramifications  of   the   use   of   such alternative   disclosures   and treatments and the treatment preferred by the independent

auditor, and any material written communications between the independent auditor and management, such as any "management" letter or schedule of unadjusted differences;

7.     To review and discuss with the independent auditor any audit problems or difficulties encountered in the course of the audit work, including management's responses to the problems, and any communications between the audit team and the independent auditors' national office respecting auditing or accounting issues presented by the engagement;

8.     To discuss with management the timing and process for implementing the rotation of the lead audit partner, the concurring partner and any other active audit engagement team partner; and

9.     To set clear Company hiring policies for employees and former employees of the independent auditor. This includes prohibiting the hiring of any current or former employees of the independent auditor into management positions overseeing financial reporting processes for one year following completion of any engagement to provide audit, review or attestation services to the Company.

B.     With respect to the internal auditing department:

1.     To review and approve the appointment and replacement of the director of the internal auditing department;

2.     To annually review and approve the performance and salary of the director of the internal auditing department;

3.     To annually review the audit plan, scope of work, budget and staffing of the internal auditing department; and

4.     To periodically review and assess the reporting relationship of the director of the internal auditing department.

C.     With respect to financial reporting principles and policies and internal audit controls and procedures:

1.     To discuss with the independent auditor and internal auditing the scope of their examinations, including, but not limited to, their annual coordinated audit plan with particular attention to areas where the Committee or the independent auditor or internal auditing believes special attention should be directed;

2.     To have the independent auditor and internal auditing perform such supplemental reviews or audits as the Committee may deem desirable;

3.     After the annual audit of the Company's financial statements, to review the independent auditor's report thereon and to confer with the independent auditor on

the degree of cooperation it received during the course of the audit, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management;

4.      To discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

5.      To recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K to be filed with the SEC;

6.      To discuss the types of information and types of presentation to be made, as it deems appropriate, regarding earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies;

7.      To discuss the Company's policies with respect to operational risk assessment and management and to discuss with management the Company's major financial risks and the steps management has taken to monitor and control such exposures;

8.      To confer with the independent auditor on its assessment of the Company's accounting and financial reporting policies and practices, the adequacy and effectiveness of internal auditing's function, recommendations for improvement, and any other pertinent matters, including the views of the independent auditor on the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting, and any other matters required to be communicated to the Committee by the independent auditor pursuant to applicable professional standards;

9.      To review with the director of the internal auditing department summaries of selected audit findings and, as appropriate, the reports of the internal auditing department relating to those findings, management's responses to the findings and management's process for correcting them, the effectiveness and independence of internal auditing's function, any significant problems or difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information, and any other pertinent matters;

10.      To review and discuss with management, the independent auditor and the director of the internal auditing department, the adequacy and effectiveness of the Company's (i) financial reporting procedures, and (ii) internal control structure, including its disclosure controls and procedures and internal control over financial reporting (including any material weaknesses, significant deficiencies, significant changes to internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls);

11.     Annually or as otherwise required pursuant to applicable rules of the  SEC, (i) to review and discuss with management, the independent auditor and the director of the internal auditing department management's internal control report, which shall state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting, and contain an assessment, as of the end of the most recent fiscal year, of the effectiveness of the Company's internal control over financial reporting, and (ii) to review and discuss with the independent auditors their attestation report on the effectiveness of the Company's internal control over financial reporting;

12.     To review, among other things, (i) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any new pronouncements of the accounting profession and other regulatory bodies, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgment made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

13.     To meet and confer separately, periodically, with management, with internal auditors (or other personnel responsible for the internal audit function) and with the independent auditor.

D.     General:

1.     To establish procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by Company associates of concerns regarding questionable accounting or auditing matters;

2.     To regularly review with the Board of Directors any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, and the performance of the internal audit function; and

3.     To prepare an annual performance evaluation of the Committee.

**Finance and Planning Committee Duties**

63.     In addition to these duties, the members of the Finance and Planning Committee owed specific duties to JCPenney under the Finance and Planning Committee's Charter to,

19

among other things, "recommend to the Board financial policies and courses of action that will effectively accommodate the Company's goals and operating strategies while maintaining a sound financial condition." These duties expressly included the duty to "review and make recommendations to the Board regarding financial transactions and commitments, including equity and debt financings, capital expenditures, and financing arrangements."

### Control, Access, and Authority

64.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of JCPenney, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by JCPenney.

65.     Because of their advisory, executive, managerial, and directorial positions with JCPenney, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of JCPenney.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of JCPenney, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

67.     To discharge their duties, the officers and directors of JCPenney were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of JCPenney were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and

accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)     remain informed as to how JCPenney conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that JCPenney was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to JCPenney and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of JCPenney, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of JCPenney, the absence of good faith on their part, and a reckless disregard for their duties to JCPenney and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to JCPenney.

69.     The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that materially overstated JCPenney's true financial health.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.  As a result, JCPenney has expended, and will continue to expend, significant sums of money to rectify defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that JCPenney had adequate liquidity to operate effectively through the end of 2013. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

72.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO JCPENNEY

75.     As a result of the Individual Defendants' wrongful conduct, JCPenney disseminated false and misleading statements.   The improper statements have devastated JCPenney's credibility.  Additionally, JCPenney is now the subject of a securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Texas.  The Company will face substantial costs in connection with an investigation and the lawsuit.

76.     As a direct and proximate result of the Individual Defendants' actions as alleged above, JCPenney's market capitalization has been substantially damaged.

77.     Further, as a direct and proximate result of the Individual Defendants' conduct, JCPenney has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

a.     costs incurred in investigating and defending JCPenney and certain officers in a securities fraud class action lawsuit currently pending in the United States District

Court for the Eastern District of Texas, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

        b.    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on JCPenney's artificially-inflated stock price and inflated revenues; and

        c.    costs incurred from the loss of the Company's customers' confidence in JCPenney services.

78.    Moreover, these actions have irreparably damaged JCPenney's corporate image and goodwill. For at least the foreseeable future, JCPenney will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that JCPenney's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of JCPenney to redress injuries suffered, and to be suffered, by JCPenney as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment. JCPenney is named as a nominal defendant solely in a derivative capacity.

80.    Plaintiff will adequately and fairly represent the interests of JCPenney in enforcing and prosecuting its rights.

81.    Plaintiff was a shareholder of JCPenney common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

82.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

83.     The Board currently consists of the following ten Individual Defendants: Ullman, Engibous, Barrett, Foster, Laybourne, Roberts, Teruel, Turner, Tysoe, and West.

**Demand Is Futile As To Defendant Ullman**

84.     Defendant Ullman faces a substantial likelihood of liability for his individual misconduct.  Defendant Ullman is also a named a defendant in a federal class action alleging that he and the Company violated §10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved materially false and misleading statements.

85.     If defendant Ullman pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.  This, in turn, would impair the defense of the class action and greatly increase the probability of defendant Ullman's personal liability in the class action.  As such, defendant Ullman is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile as to defendant Ullman.

86.     Additionally, defendant Ullman cannot render an independent decision because he is and was a high-ranking officer of JCPenney during the time period when the wrongdoing occurred.  Defendant Ullman has served as the CEO of JCPenney throughout the Relevant Period.  According to the Company, defendant Ullman is not an independent director.  Thus, defendant Ullman is a current Company insider and therefore cannot independently consider a demand.

87.     Additionally, defendant Ullman is interested because he issued many of the false and misleading statements.  Defendant Ullman therefore faces a substantial likelihood of liability for breaching his fiduciary duties to JCPenney shareholders.  Consequently, defendant Ullman cannot disinterestedly consider a demand.

### Demand Is Futile As To The Audit Committee Defendants

88.     Defendants Engibous, Foster, Roberts, Teruel, and West (comprising half of the Board), as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and JCPenney's internal controls over financial reporting.  Despite these duties, the Audit Committee Defendants knowingly and/or recklessly reviewed and approved false financial statements and press releases.  In particular, the Audit Committee Defendants knew that:

- The August 20, 2013 press release announcing second quarter financial results and stating that JCPenney had sufficient liquidity for all of 2013 was materially misleading by virtue of their review of internal Company financial data;

- The statements made by Defendants Ullman and Hannah in the August 20, 2013 conference call that JCPenney would have sufficient liquidity for all of 2013 without the need for additional fundraising was materially misleading because, on information and belief, the Audit Committee Defendants were aware of a possible secondary public offering of Company stock;

- The September 26, 2013 press release positively portraying JCPenney's financial condition was materially misleading because the Audit Committee Defendants knew that the Company would announce a secondary public offering of stock to raise much needed funds that very same day; and

- Defendant Ullman's September 26, 2013 statement that "we don't see conditions this year where we'd need to raise liquidity" was materially false because defendant Ullman and the Audit Committee Defendants knew that the Company would

announce a secondary public offering of stock to raise much needed funds that very same day.

89.     Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

### Demand Is Futile As To The Finance And Planning Committee Defendants

90.     Defendants Engibous, Roberts, Teruel, and Tysoe (who, along with inside director Ullman, comprise half of the Board), as Finance and Planning Committee members, were responsible for "review[ing] and mak[ing] recommendations to the Board regarding financial transactions and commitments, including equity and debt financings, capital expenditures, and financing arrangements." Thus, in furtherance of this duty, the Finance and Planning Committee Defendants knew about, reviewed, and recommended to the Board the secondary public offering of Company stock to raise approximately $1 billion that was announced on September 26, 2013. Given the complexity and size of the public offering, the Finance and Planning Committee Defendants learned about this plan at least by the beginning of the Relevant Period.

91.     As a result, the Finance and Planning Committee Defendants knew that JCPenney was in need of additional liquidity and that the Individual Defendants' statements to the contrary on August 20, 2013 and September 26, 2013 were materially misleading.  Despite this knowledge, the Finance and Planning Committee Defendants approved and/or failed to correct these statements in breach of their fiduciary duties.  Accordingly, the Finance and Planning Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon these Defendants therefore is futile.

### Demand Is Futile As To All Directors For Additional Reasons

92.    If JCPenney's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by Directors and Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by JCPenney against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of JCPenney, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

93.    Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting JCPenney by prosecuting this action.  Therefore, demand on JCPenney and its Board is futile and is excused.

94.    JCPenney has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     The Individual Defendants owed and owe JCPenney fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe JCPenney the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

97.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

98.     The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JCPenney has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

100.    Plaintiff, on behalf of JCPenney, has no adequate remedy at law.

## COUNT II

### Against The Individual Defendants For Unjust Enrichment

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of JCPenney.

103.    Each Individual Defendant was unjustly enriched as a result of substantial incentive-based compensation they received while breaching his fiduciary duties owed to JCPenney.

104.    Plaintiff, as a shareholder and representative of JCPenney, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

105.    Plaintiff, on behalf of JCPenney, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment;

B.    Directing JCPenney to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JCPenney and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of JCPenney to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of JCPenney's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters;

- a provision to appropriately test and then strengthen the internal audit and financial disclosure control functions;

C.      Awarding to JCPenney restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

106.      Plaintiff demands a trial by jury.

Dated: October 2, 2013

THE BRISCOE LAW FIRM

By: _____
   WILLIE C. BRISCOE

8150 North Central Expressway, Suite 1575
Dallas, Texas 75206
(T): (214) 239-4568
wbriscoe@thebriscoelawfirm.com

Frank J. Johnson
Shawn E. Fields
JOHNSON & WEAVER, LLP
110 West "A" Street, Suite 750
San Diego, CA 92101
(T) 619.230.0063
frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Douglas W. Weitzman, hereby verify that I am a shareholder of J.C. Penny Company, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.   I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true.   As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.   Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date:   9/30/13

Douglas W. Weitzman

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 5/28/13 | 900 | 18.75 |
| 7/22/13 | 2000 | 16 |
| 8/5/13 | 4000 | 16.50 |

Sales:

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |
| | | |